2021R00164/KMR/DVS

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. James B. Clark, III |
| v. | : | Magistrate. No. 22-12168 |
| MUHAMMAD MIRZA,<br>DEVON BURT,<br>HALLUM GELZER, and<br>PUNSON FIGUEROA<br>a/k/a "Susie Figueroa" | : | **CRIMINAL COMPLAINT** |

I, Alex Colon, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Task Force Officer with the United States Drug Enforcement Administration, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

Alex Colon, Task Force Officer
U.S. Drug Enforcement
Administration

Task Force Officer Alex Colon attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this 22nd day of June 2022.

Hon. James B. Clark, III
United States Magistrate Judge

## ATTACHMENT A

### Count One
### Conspiracy to Commit Health Care Fraud

From at least as early as in or around 2019 through in or around June 2022, in the District of New Jersey and elsewhere, defendants

**MUHAMMAD MIRZA,**
**DEVON BURT, and**
**HALLUM GELZER**

knowingly and intentionally conspired and agreed with one another and others to execute a scheme and artifice to defraud the National Railroad Passenger Corporation (Amtrak) Healthcare Plan, a health care benefit program as defined under Title 18, United States Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1349.

## Counts Two Through Sixteen
## Health Care Fraud

From in or around March 2021 through June 2022, and on or around the dates specified below, in the District of New Jersey and elsewhere, defendant

**PUNSON FIGUEROA**
**a/k/a "Susie Figueroa"**

knowingly and willfully executed and attempted to execute a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the control of the National Railroad Passenger Corporation (Amtrak) Healthcare Plan, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services.

| Count | Service Date | Patient | Provider | Amount of Claim | Date Claim Received | Date Claim Paid |
|---|---|---|---|---|---|---|
| 2 | May 4, 2021 | UC-1 | Provider-1 | $345.00 | June 22, 2021 | July 8, 2021 |
| 3 | May 4, 2021 | UC-1 | Provider-2 | $473.97 | June 25, 2021 | July 8, 2021 |
| 4 | May 8, 2021 | UC-1 | Provider-1 | $245.00 | June 22, 2021 | July 8, 2021 |
| 5 | May 8, 2021 | UC-1 | Provider-2 | $236.61 | June 22, 2021 | July 8, 2021 |
| 6 | May 10, 2021 | UC-1 | Provider-1 | $245.00 | June 22, 2021 | July 8, 2021 |
| 7 | May 10, 2021 | UC-1 | Provider-2 | $236.61 | June 22, 2021 | July 8, 2021 |
| 8 | May 13, 2021 | UC-1 | Provider-1 | $240.00 | June 22, 2021 | July 8, 2021 |
| 9 | May 13, 2021 | UC-1 | Provider-2 | $236.61 | June 22, 2021 | July 8, 2021 |
| 10 | May 17, 2021 | UC-1 | Provider-1 | $245.00 | June 22, 2021 | July 8, 2021 |
| 11 | May 17, 2021 | UC-1 | Provider-2 | $236.61 | June 22, 2021 | July 8, 2021 |
| 12 | May 20, 2021 | UC-1 | Provider-1 | $245.00 | June 22, 2021 | July 8, 2021 |
| 13 | May 20, 2021 | UC-1 | Provider-2 | $236.61 | June 22, 2021 | July 8, 2021 |
| 14 | May 24, 2021 | UC-1 | Provider-2 | $236.61 | June 22, 2021 | July 8, 2021 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 15 | May 27, 2021 | UC-1 | Provider-1 | $245.00 | June 22, 2021 | July 8, 2021 |
| 16 | May 27, 2021 | UC-1 | Provider-2 | $236.61 | June 22, 2021 | July 8, 2021 |

In violation of Title 18 United States Code, Section 1347.

## ATTACHMENT B

I, Alex Colon, am a Task Force Officer with the U.S. Drug Enforcement Administration. The information contained in the complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including video surveillance, witness statements, business records, bank records, and other documents. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

1. At all times relevant to this Criminal Complaint:

a. The National Railroad Passenger Corporation ("Amtrak") was a passenger railroad service that operated a nationwide rail network.

b. Defendant MUHAMMAD MIRZA ("MIRZA") was a resident of Fanwood, New Jersey and previously a resident of Cedar Grove, New Jersey, and a medical doctor. He maintained offices in New Jersey, New York, and elsewhere.

c. Defendant PUNSON FIGUEROA a/k/a "Susie Figueroa" ("FIGUEROA") was an acupuncturist who was a resident of Long Island City, New York, and previously a resident of Whitestone, New York, and maintained an office in New York, New York.

d. Defendant DEVON BURT ("BURT") was a resident of Blue Bell, Pennsylvania and previously a resident of Horsham, Pennsylvania, and an Amtrak employee.

e. Defendant HALLUM GELZER ("GELZER") was a resident of East Orange, New Jersey and previously a resident of Staten Island, New York.

f. "CC-1" was a co-conspirator and medical provider. CC-1 worked in offices controlled by MIRZA including offices in New York City and Jersey City, New Jersey.

g. "CC-2" was a co-conspirator and an Amtrak employee.

h. "UC-1" was an undercover law enforcement agent posing as an Amtrak employee.

i. "Provider-1" was an individual associated with FIGUEROA who purportedly provided acupuncture services.

j. "Provider-2" was an individual associated with FIGUEROA who purportedly provided physical therapy services.

k. "Employee-1" was a nurse practitioner who was employed by MIRZA on an hourly basis.

l. "Individual-1" was an individual with employer-provided health insurance who resided in New Jersey.

m. "Biller-1" was an individual who worked for MIRZA on billing matters.

n. "Company-1" was the administrator of Amtrak's health care benefits plan.

o. "Company-2" was another administrator of health care benefits, not associated with the Amtrak health care benefits plan.

**Background**

2. Amtrak provided its employees with a health care benefits plan (the "Amtrak health care plan"), which insured participating Amtrak employees who paid premiums through monthly payroll deductions (the "Amtrak health care plan participants"). Amtrak's health care plan was a "health care benefit program," as defined by 18 U.S.C. § 24(b).

3. The Amtrak health care plan reimbursed providers of medical services, including physicians and medical clinics (collectively, "providers"), that treated Amtrak heath care plan participants.

4. The Amtrak health care plan required providers to submit claim forms in order to receive reimbursement for medical services provided to Amtrak heath care participants. Among other information, providers were required to include in the claim forms: (1) the Amtrak health care plan participant's name and ID number; (2) the type of service provided (identified by a standardized procedure code known as a CPT Code); (3) the date the service was provided; (4) the charge for the service; (5) the diagnosis (identified by a standardized diagnostic code number, known as the ICD-10 Diagnosis Code); and (6) the provider's name and/or identification number.

5. The Amtrak health care plan paid only medically necessary claims for patients covered under the health care plan. To encourage patients to receive cost-effective and medically necessary treatments, the Amtrak health care plan required

participants to make payments toward their own health care in the form of co-insurance, co-payments, and deductibles.

6. Company-1 processed claims for Amtrak's health care plan. Amtrak health care plan participants had access to their claims information via the Company-1 website and mobile application.

7. A National Provider Identifier ("NPI") is a unique, 10-digit number that constitutes a means of identification for health care providers. NPIs are used for medical billing. Providers must share their NPI with other providers, health plans, clearinghouses, and any entity that may need the NPI for billing purposes.

## The Health Care Fraud Scheme

8. From at least as early as 2019 and continuing to the present, MIRZA, FIGUEROA, GELZER, BURT, and others recruited Amtrak employees—primarily from New Jersey and New York—to participate in the scheme by offering cash payments in exchange for the employees agreeing to allow MIRZA, FIGUEROA, and others use their patient and insurance information to submit fraudulent claims to insurers, including Company-1. MIRZA, FIGUEROA, and others benefitted from this scheme by receiving payments from the Amtrak health care plan, via Company-1, for services that they never provided or that were medically unnecessary. Separately, GELZER, BURT, and others benefitted from this scheme by receiving cash payments from providers, including CC-1, in return for allowing those providers to use their personal and insurance information to submit fraudulent claims and for recruiting others to participate in the scheme.

9. In total, the Amtrak health care plan has paid at least approximately $9 million as a result of claims associated with providers connected to the health care fraud scheme.

### Muhammad Mirza

10. CC-1 and MIRZA agreed to share in the illicit profits obtained through submitting false and fraudulent claims to health benefit plans. MIRZA agreed to pay CC-1 a percentage of false claims that MIRZA received reimbursement from the Amtrak health care plan for. MIRZA provided CC-1 with office space in New Jersey and New York City and provided CC-1 with access to NPI for billing purposes in furtherance of the scheme.

11. CC-1 recruited and introduced complicit patients who were willing to participate in the scheme, including Amtrak health care plan participants. MIRZA and CC-1 would cause the patients' insurance plan to be billed for treatments not provided and CC-1 would provide the patients with a cash payment, i.e., a kickback, for claims paid to the MIRZA-provided NPIs, as compensation for the patients' participation in the scheme. The amount of the kickback was frequently calculated

as a percentage of the claims that MIRZA successfully billed to the patient's insurance company.

12. MIRZA and CC-1 agreed to share in the proceeds of the scheme. Over the course of the conspiracy, MIRZA transferred proceeds from his bank accounts via check to accounts controlled by CC-1.

13. Separately, CC-2 permitted his personal and insurance information to be used for false and fraudulent billing to the Amtrak health care plan, and in exchange CC-2 received cash payments from CC-1 to commit acts of health care fraud. In total, the Amtrak health care plan has paid at least approximately $88,731 as a result of claims for medical services allegedly provided to CC-2 by providers connected to the health care fraud scheme.

14. MIRZA employed other health care providers, including Employee-1, who was employed by MIRZA on an hourly basis. Employee-1 was hired by MIRZA and provided certain treatments to patients as ordered by MIRZA.

15. MIRZA used, transferred, and possessed Employee-1's name and NPI to submit false and fraudulent claims on behalf of Amtrak employees. For example, MIRZA used Employee-1's name and NPI to submit claims to Company-1 for medical treatment purportedly received by CC-2, an Amtrak employee, on at least seven service dates in August, September, and November 2019. Employee-1 has confirmed to law enforcement that none of the medical services alleged to have been provided on those dates was ever provided by Employee-1 to CC-2. As a result of these seven false and fraudulent claims, the Amtrak health care plan paid approximately $8,835.65.

16. Law enforcement lawfully obtained text messages between MIRZA and CC-1, in which MIRZA and CC-1 discussed the health care fraud scheme. For example, on or about November 4, 2019, CC-1 sent MIRZA a text message containing a screenshot of an Amtrak employee's summary of benefits as displayed on the employee's Company-1 mobile app, with the following text:

"Amtrak !!!!!! We have 20-30!"

17. The conversation continued:

| | |
|---|---|
| MIRZA: | Great! |
| MIRZA: | Hit mri |
| CC-1: | Have to get to 100 |
| MIRZA: | Yup |
| CC-1: | Yup |
| MIRZA: | Doc these are gold |
| MIRZA: | Yup |

18. On or about August 20, 2020, CC-1 texted MIRZA to inquire whether he could use a particular health care provider to bill Company-1:

CC-1: Can [Provider] bill [Company-1]? Do we know
MIRZA: Not sure
MIRZA: I think she is flagged
MIRZA: [Biller-1] knows
CC-1: So how can I bill through [Company-1]
CC-1: All denials
CC-1: Who can I use for [Company-1]
CC-1: Also I need those proposals from [Company-2] sent to [Biller-1] can you ask her for them
MIRZA: Call her

19. On or about December 28, 2020, CC-1 engaged in the following text exchange with MIRZA during which they discussed office rent and the use of Employee-1's name to continue billing in connection with the health care fraud scheme:

CC-1: Any funds come in
MIRZA: Some
MIRZA: What is the plan?
MIRZA: I am still paying 7k rent here
MIRZA: Plus china man
CC-1: We will use [Employee-1's first name] for re start in January and continue forward
CC-1: Unless we have a doctor for ny

20. On or about March 2, 2022, in a recorded call, MIRZA and CC-1 discussed setting up a corporation to continue the health care fraud scheme. MIRZA stated that "the safest way to do it" was for MIRZA to use his Florida medical license, "open up a company with a Florida addresses [which] we can buy, and mail can come through Delaware for [Biller-1]," and "we will not use the New York address, to prevent any issues." CC-1 told MIRZA that CC-1 had identified two nurse practitioners, and MIRZA said that they would "bill it under the nurse practitioners," not under MIRZA's information, and "when the money comes in, obviously we will split it minus the cost of the nurse practitioners." MIRZA said that he would talk to Biller-1 to see if she was interested.

**Devon Burt and Hallum Gelzer**

21. BURT and GELZER agreed with CC-1 to participate in the health care fraud scheme involving CC-1 and MIRZA. Law enforcement lawfully obtained video and audio recordings of BURT discussing the health care fraud scheme with CC-1. For example, on or about September 28, 2021, BURT met with CC-1 and asked

what CC-1 would pay for a referral fee. BURT stated that he wanted $1000 per referral. BURT told CC-1 that BURT had a lot of influence over a lot of Amtrak employees and that BURT could take them to other practitioners if CC-1 did not accede to BURT's demands. BURT stated that CC-1 needed to pay consistently, like FIGUEROA. CC-1 provided BURT with a U.S. Postal Service Money Order for $400 at this meeting in return for BURT's participation in the scheme.

22. MIRZA utilized Employee-1's name and NPI to submit false and fraudulent claims on behalf of BURT. For example, MIRZA used Employee-1's name and NPI to submit claims to Company-1 for medical services purportedly provided by Employee-1 to BURT on at least nineteen service dates from December 2019 through March 2020. Employee-1 has confirmed to law enforcement that she never provided these medical services to BURT. As a result of these nineteen false and fraudulent claims, the Amtrak health care plan paid approximately $25,239.47.

23. In total, the Amtrak health care plan has paid at least approximately $63,390 as a result of claims associated with BURT for medical services allegedly provided to BURT by providers connected to the health care fraud scheme. The Amtrak health care plan has also paid at least approximately $64,540 as a result of claims for BURT's family members, for medical services allegedly provided to BURT's family members by providers connected to the health care fraud scheme.

24. GELZER communicated by text message with CC-1 about how he and BURT were working together to recruit Amtrak employees to the scheme. On or about December 1, 2021, in text messages lawfully obtained by law enforcement, GELZER and CC-1 engaged in the following text message exchange:

| | |
|---|---|
| GELZER: | Me and d Burke |
| GELZER: | Flooded |
| GELZER: | With new |
| CC-1: | ? |
| GELZER: | Huh |
| GELZER: | ? |
| CC-1: | Flooded? |
| GELZER: | Duhhhhh lol lol |
| GELZER: | Yesss |
| GELZER: | U know how I do |
| CC-1: | Ha 😃 |
| GELZER: | Got u me Devin |
| GELZER: | Devin got 26 years in amtrack |
| GELZER: | He knows tons |
| GELZER: | I fixed that crap too |
| GELZER: | That he was saying |
| CC-1: | Excellent. Devon burt |
| CC-1: | Wow |

| | |
|---|---|
| GELZER: | Yes |
| GELZER: | He's My guy I glad I got with him |
| CC-1: | You sgould [sic] be looking great !!! |
| GELZER: | So all u gotta do is be ready to play |
| GELZER: | I got people ready |

25. On or about November 22, 2021, BURT again met with CC-1 and discussed the health care fraud scheme, in an audio and video recorded meeting. BURT said that GELZER was a friend that he had known for years. BURT told CC-1 that CC-1 needed to be there with the money and they would get the customers rolling in. BURT told CC-1 that he could be a buffer between the Amtrak employees and CC-1.

26. At this meeting, BURT referenced a news article regarding MIRZA. BURT told CC-1 that CC-1 needed to distance himself from MIRZA who was in "gigantic trouble." BURT encouraged CC-1 to break from MIRZA and others to build CC-1's own scheme where CC-1 controlled the money and the providers. CC-1 provided BURT with $500 in U.S. Postal Service Money Orders at this meeting in satisfaction of what CC-1 and BURT agreed that CC-1 owed BURT in return for BURT permitting his personal and insurance information to be used for billing.

27. Law enforcement lawfully obtained video and audio recordings of GELZER discussing the scheme with CC-1. For example, GELZER met with CC-1 and discussed the health care fraud scheme in a meeting on or about November 22, 2021. GELZER brought Individual-1 to meet CC-1, after having previously texted CC-1 an image of Individual-1's Company-1 insurance card. In this meeting among GELZER, Individual-1, and CC-1, CC-1 explained the health care fraud scheme to Individual-1.

28. CC-1 told Individual-1 that CC-1 would bill Individual-1's insurance, but that he would not go overboard. CC-1 said the billing would appear on Individual-1's Company-1 mobile application, so Individual-1 would know what was being billed. CC-1 said that he would pay Individual-1 a percentage of the billing, and if Individual-1 was happy with how things went, Individual-1 could refer others to CC-1. Individual-1 provided his personal and insurance information to CC-1.

29. At this meeting GELZER told Individual-1, in CC-1's presence, that GELZER had been working with CC-1 for some time and had made CC-1 a millionaire. GELZER privately told CC-1 that Individual-1 was a well connected employee of a school district in a large New Jersey city and that Individual-1 could provide a lot of patients with Company-1 insurance.

30. In a recorded telephone call on or about March 1, 2022, GELZER stated to CC-1 that GELZER had put BURT in charge of dealing with the Amtrak employees. GELZER stated that he and BURT were working with a chiropractor,

and that GELZER and BURT planned to demand that 20% of the billing be paid to them in return for providing patients, including Amtrak employees.

31. Law enforcement obtained audio recordings of GELZER communicating a threat to CC-1 and facilitating three-way telephone calls in which threats were communicated to CC-1 by an individual using BURT's cell phone number. On or about May 27, 2022, GELZER told CC-1 in a telephone call that an individual who had participated in the health care fraud scheme was demanding that CC-1 pay $4,600 that he was owed in connection with the scheme. GELZER refused to name the person but said that the person knew where CC-1 lived. GELZER said that the individual was connected to people that would "come and see you asap" if CC-1 didn't pay the money and that he was "not playing." GELZER said that the individual had come to meet with GELZER in East Orange, New Jersey previously and had displayed a gun in his pants.

32. CC-1 asked to speak to the person issuing the threat, and GELZER initiated a three-way call between CC-1, GELZER, and BURT's cell phone number. On that call, the individual using BURT's cell phone number demanded that CC-1 pay $5,100 to GELZER. He claimed that CC-1 had treated him and his family members at CC-1's Jersey City, New Jersey office, and he threatened to come to CC-1's home address, which he stated by house number, street, city, and state. He said to CC-1, "I know where you're at, you can't run, so hand my fucking money, I'm connected, so hand my money." He said to CC-1, "whatever your life means to you, if your life ain't worth $5,100, all right then, we can discontinue this conversation." He further said to CC-1 that if GELZER didn't get the money from CC-1, "I'll send somebody to your house." The individual refused to identify himself by name. Phone records further showed that on May 27, 2022, GELZER communicated with BURT's cell phone number in several telephone calls before and after the threatening calls to CC-1.

33. Following these phone calls, GELZER contacted CC-1 via numerous text messages and several telephone calls, encouraging CC-1 to pay the money. For example, GELZER texted CC-1 the individual was "calling my phone every day" and that CC-1 should "Be smart with this cat he really do walk around with heat." GELZER further texted CC-1 that "if you think its a game he will show u he's not a game." In a telephone call, GELZER said that the individual told him to tell CC-1 that if he did not get payment by the next day, CC-1 should "check your mailbox."

34. GELZER called and attempted to call the individual issuing the threat several times on subsequent calls with CC-1 by dialing BURT's cell phone number.

**Punson Figueroa a/k/a "Susie Figueroa"**

35. In or around January 2021, CC-2 was approached by law enforcement and acknowledged his role in the health care fraud scheme. Thereafter, law enforcement officers provided CC-2 with covert recording devices to capture digital video and audio recordings of meetings between CC-2 and FIGUEROA. CC-2 met with FIGUEROA several times in 2021, at the direction of law enforcement and in furtherance of the investigation.

36. For example, on or about March 2, 2021, CC-2 1 met in person with FIGUEROA at FIGUEROA's office in New York, New York. At that meeting, FIGUEROA told CC-2 that she would bill CC-2's insurance for acupuncture and physical therapy at a rate of six to eight visits per month, regardless of how many times CC-2 came to her office. FIGUEROA informed CC-2 that she would bill CC-2's insurance for visits in January and February 2021, although CC-2 had neither visited FIGUEROA nor received any treatment in those months. FIGUEROA asked CC-2 to sign forms for the fictitious January and February visits, and asked CC-2 to sign a sheet of paper on multiple lines, leaving the dates blank for FIGUEROA to fill in.

37. FIGUEROA handed CC-2 an envelope filled with $1000 cash and instructed CC-2 not to visit any other chiropractors, physical therapy, or acupuncture providers without letting her know.

38. Thereafter, FIGUEROA submitted and caused to be submitted false claims to Amtrak's health care plan indicating that CC-2 had visited Provider-1 and Provider-2 eleven times in February 2021 and sixteen times in January 2021, purportedly receiving acupuncture and physical therapy services. As a result of these false and fraudulent claims, the Amtrak health care plan paid approximately $13,356.

39. On or about March 2, 2021, UC-1, an undercover law enforcement agent posing as an Amtrak employee, conducted a consensually recorded telephone call with FIGUEROA while UC-1 was located in Bergen County, New Jersey. In sum and substance, FIGUEROA agreed that UC-1 could visit her office on Monday, March 4, 2021. FIGUEROA requested that UC-1 text her his full name and cell phone number.[1]

---

[1] FIGUEROA has also communicated via text message to the phone number associated with UC-1 on other occasions. For example, on or about March 2, 2022 and March 7, 2022, FIGUEROA communicated via text message with law enforcement agents posing as UC-1, while the law enforcement agents were located in New Jersey.

40. On or about June 17, 2021, CC-2 met in person with FIGUEROA at FIGUEROA's office in New York, New York, and brought UC-1 with him to the office. FIGUEROA met privately with CC-2 and thanked CC-2 for bringing UC-1. FIGUEROA told CC-2 that she would slowly start billing UC-1's account, and that she would bill back to April, May, and June 2021 on UC-1's account.

41. Based on my training and experience and on information developed through the course of the investigation, I understood FIGUEROA to mean that she would bill UC-1's insurance for visits in April, May, and June 2021 that never took place.

42. FIGUEROA instructed CC-2 to tell UC-1 not to speak to his boss or the insurance company about the money. FIGUEROA further stated that if the insurance company asked if FIGUEROA gave CC-2 anything, CC-2 should say no. At this visit, FIGUEROA gave CC-2 a total of $2000 in cash. FIGUEROA told CC-2 that she was giving him $1000, and $500 for UC-1, in addition to another $500. Based on my training and experience, and on information developed during the course of the investigation, I understood FIGUEROA to mean that she was giving $1000 to CC-2 in return for CC-2's agreement to permit his personal and insurance information to be used to submit false and fraudulent claims, she was giving $500 to CC-2 to give to UC-1, and the additional $500 was for CC-2 in return for CC-2 referring UC-1 to FIGUEROA.

43. UC-1 separately met in person with FIGUEROA on the same date.[2] FIGUEROA provided UC-1 with paperwork to sign. FIGUEROA instructed UC-1 to sign his name about 30 times for services received and instructed UC-1 not to date the signatures. FIGUEROA stated to UC-1, in sum and substance, that UC-1 had good insurance, and that Amtrak has very good benefits. FIGUEROA advised UC-1 not to worry, and that UC-1's job would not be in jeopardy by coming to her.

44. Thereafter, FIGUEROA submitted or caused to be submitted false claims to Amtrak's health care plan indicating that UC-1 had visited Provider-1 and Provider-2 at least seven times in May 2021, purportedly receiving acupuncture and physical therapy services. As a result of these false and fraudulent claims, the Amtrak health care plan paid approximately $3,940.

45. Following UC-1's in-person meeting with FIGUEROA on or about June 17, 2021, UC-1 visited FIGUEROA's office on one other occasion on or about July 29, 2021. At this meeting, which was audio and video recorded, UC-1 met with FIGUEROA and she handed UC-1 an envelope filled with $1000 cash.

---

[2] This interaction was not captured on video and audio recording, due to malfunctioning equipment.

46. Although UC-1 has not met with FIGUEROA since July 29, 2021, FIGUEROA continued to use UC-1's personal and insurance information to submit false and fraudulent claims to the Amtrak health care plan, including false and fraudulent claims for services purportedly provided in August 2021 and September 2021.

47. As of June 1, 2022, FIGUEROA has submitted or caused to be submitted a total of approximately 73 claims to the Amtrak health care plan associated with UC-1. As a result of these false and fraudulent claims, the Amtrak health care plan has paid approximately $31,840.77.

48. The Amtrak health care plan has paid in excess of $7 million in claims for medical services purportedly provided by FIGUEROA and providers known to be associated with FIGUEROA to Amtrak employees. FIGUEROA herself has billed the Amtrak health care plan in excess of $1 million for medical services purportedly provided to Amtrak employees, from 2020 to the present.